.1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4    LA CARRIERS, LLC, as          CIVIL ACTION NO.

 5    owner and Operator of the     13-06731 C/W 14-203

 6    M/V TRISTEN                   SECTION "L"

 7                                  JUDGE ELDON E.

 8    VERSUS                        FALLON

 9                                  MAGISTRATE JUDGE

10    FIVE B'S, INC. In             MICHAEL NORTH

11    personam M/V BEVERLY G.

12    BARRIOS, in rem

13

14

15

16            Deposition of JODY BERNARD, 359 East 18th

17    Street, LaRose, Louisiana 70373, taken in the

18    offices of Joseph F. Gaar, Jr., 617 S. Buchanan

19    Street, Lafayette, Louisiana on Thursday, January

20    29, 2015.

21

22

23

      REPORTED BY:

24         BETTY GLISSMAN

           CERTIFIED COURT REPORTER

25

**Exhibit-1**

```
 1    APPEARANCES:
 2            LAW OFFICES OF JOSEPH F. GAAR, JR.
              (BY:  JASON M. WELBORN, ESQUIRE)
 3            617 S. Buchanan Street
              Lafayette, Louisiana  70501
 4
                   ATTORNEYS FOR THE PLAINTIFF
 5
 6             STAINES & EPPLING
              (BY:  JEFF D. PEULER, ESQUIRE)
 7            3500 North Causeway Boulevard
              Suite 820
 8            Metairie, Louisiana 70002
 9                   ATTORNEYS FOR FIVE B'S, INC., TOTAL
                     MARINE LOGISTICS, L.L.C., AND M/V
10                   BEVERLY G. BARRIOS
11
              JONES, WALKER, LLP
12            (BY:  WILLIAM C. BALDWIN, ESQUIRE)
              201 St. Charles Avenue
13            Suite 5100
              New Orleans, Louisiana  70170
14
                   ATTORNEYS FOR ENTERPRISE MARINE
15
16            FRILOT, LLC
              (BY:  ROBERT PATRICK RAY, ESQUIRE)
17            1100 Poydras Street
              Suite 3700
18            New Orleans, Louisiana  70501
19
                   ATTORNEYS FOR LA CARRIERS, LLC
20
21
22    THE VIDEOGRAPHER:  BOB LAROUSSINI
23
24
25
```

1                E X A M I N A T I O N   I N D E X
2                                                    Page
3

        MR. PEULER                                  6
4       MR. BALDWIN                               194
        MR. RAY                                   259
5       MR. PEULER                                263
        MR. BALDWIN                               273
6       MR. PEULER                                275
7

                 E X H I B I T     I N D E X

8
9       Exhibit #1                                 18
        Driver's License
10
        Exhibit #2                                108
11      Statement of Jody Bernard
12      Exhibit #3                                108
        Case Report
13
        Exhibit #4                                109
14      Google Earth Maps
15      Exhibit #5                                161
        United States Coast Guard Maritime
16      Information Exchange Incident
        Investigation Report
17
        Exhibit #6                                182
18      Job Listings
19
20
21
22
23
24
25

1        S T I P U L A T I O N

2

3        It is stipulated and agreed by and between

4   Counsel that the deposition of JODY BERNARD, on

5   Thursday, January 29, 2015, is hereby being taken

6   under the Federal Rules of Civil Procedure for all

7   purposes as permitted under law.

8

9        The witness reserves the right to read and

10  sign the deposition.  The original is to be

11  delivered to and retained by the noticing attorney

12  for proper filing with the Clerk of Court.

13

14       All objections, except those as to the form

15  of the question and/or the responsiveness of the

16  answers, are reserved until the time of the trial of

17  this cause.

18

19       Betty D. Glissman, Certified Court Reporter,

20  Certificate No. 86150, in and for the State of

21  Louisiana, officiated in administering the oath to

22  the witness.

23

24

25

```
1       A.      Yes.  Brah, if you go look up the rules.
2   When a captain is at the wheel, he is the captain of
3   the vessel.
4       Q.      And then -- so you are the captain and
5   you work on those three vessels.  Where are those --
6   where is most of your work taking place?
7       A.      Around the New Orleans area.  Mostly
8   around the New Orleans area if you didn't hear.
9       Q.      Okay.  What kind of barges -- were you
10  pushing mainly barges or were you doing other work?
11      A.      We was pushing -- when I got hurt, I was
12  pushing salt barges.
13      Q.      Okay.  What about prior to -- I am not
14  talking about the day of the incident.
15      A.      We did all kind of work for Russell.
16  Man, we pushed construction barges.  We pushed
17  sweetener barges to Tampa sometimes.  Whatever job
18  they had for you, you went to do.
19      Q.      And you say that the day of the incident,
20  you were pushing salt barges?
21      A.      Yes, sir.
22      Q.      How many salt barges?
23      A.      I had six of them.
24      Q.      Six.  Are they stacked two, two and two,
25  or three and three?
```

```
 1    BY MR. PEULER:

 2        Q.      Talking to the captain of the port, COTP?

 3        A.      That's the bridge.  That's the only one I

 4    talked to is the bridge, Bayou Dularge Bridge.

 5        Q.      Okay.  And what did you tell him?

 6        A.      That I was going through.

 7        Q.      Okay.  Did you let them know that you had

 8    a flagged vessel?

 9        A.      A flagged vessel?

10        Q.      Oversized vessel.

11        MR. RAY:

12                Object to the form.

13        MR. WELBORN:

14                Same objection.

15        THE WITNESS:

16                No.  No flag oversize.  We had our

17        permits.  We had everything.  We was legal.

18    BY MR. PEULER:

19        Q.      Okay.  I am not saying anything illegal,

20    but is it your testimony that the flotilla of the

21    TRISTEN, that the size wasn't an oversized flotilla?

22        MR. RAY:

23                Object to form.

24        THE WITNESS:

25                When you got a six-pack, two of them
```

1          side --

2                    MR. WELBORN:

3                              Join the objection.

4                    THE WITNESS:

5                              -- you get a permit to push the wide

6          tow.  And the companies do that for us.  They

7          get the permits.

8     BY MR. PEULER:

9          Q.     Okay.  And you don't play any role in

10    that as a captain?

11         A.     No.  I usually don't play no role in

12    that.

13         Q.     Okay.  Are there any rules that apply

14    differently?

15         A.     You got to stop and let people pass you

16    or pass by you if they want to.

17         Q.     Anything else?

18         A.     Basically, that's it.

19         Q.     Okay.  Okay.  So you go under the bridge

20    and keep going.  Are there any vessels in front of

21    you?

22         A.     No, no.

23         Q.     And right now, we're looking at --

24         A.     I think I am all by myself, really.  When

25    I get about right here somewhere, they start coming

1  worry about him way down here right now.  He's

2  making about seven, eight miles an hour.  I am only

3  doing about three at the time.

4      Q.    Right.

5            Okay.  So the MANNIE contacts you, makes

6  arrangements to pass and then we are going to go to

7  photo #4, which is a little bit closer of the bend,

8  a zoom-in of the bend; is that right?

9      A.    That's right.

10     Q.    Okay.  In this photo, does it show the

11  general location where the --

12     A.    The --

13           MR. WELBORN:

14                Wait, let him ask the question.

15  BY MR. PEULER:

16     Q.    -- where the MANNIE overtook the TRISTEN?

17     A.    Right there.

18     Q.    Okay.  Can you draw a big red box right

19  there.

20     A.    (Witness complies.)

21     Q.    Okay.  And so the box on #4, page 4 MPP

22  of the Google map would be the area that the MANNIE

23  overtook the TRISTEN.

24           Was there any problems with him

25  overtaking you?

1      A.      That man passed me and had no problem and

2      cleared me.  I don't know why they are there -- here

3      today even.

4      Q.      Okay.  So you didn't -- you didn't get on

5      the radio and curse anybody out after?

6      A.      I might have said a curse word or

7      something.  I mean, I got hit.  I was cursing at

8      somebody.  All I wanted from the MANNIE was to

9      get -- how would I say that?  A report of what

10     happened to have my backup.  That's all I wanted

11     from the guy.

12     Q.      Okay.  You didn't get on the radio and

13     say, "You cut me off"?

14     A.      No.  I don't know what I said, dude.

15     Q.      Okay.  People were telling me --

16     A.      Somebody just hit me in the back, almost

17     made me flip over a chair.  I probably did some

18     cursing when I first came on the radio.  I remember

19     the BEVERLY BARRIOS apologizing to me on the radio.

20     Q.      My question is, after the incident was

21     over, do you recall getting on the radio with the

22     captain of the Enterprise?

23             MR. BALDWIN:

24                  Object to the form.

25             MR. WELBORN:

```
 1              MANNIE.

 2         MR. PEULER:

 3              The captain of the MANNIE.

 4         THE WITNESS:

 5              How am I supposed to take you

 6     serious?

 7         MR. WELBORN:

 8              Stop.

 9    BY MR. PEULER:

10     Q.    All right.

11     A.    All I wanted was information from him.

12    That's all I wanted.

13     Q.    Okay.

14     A.    He had nothing do with the accident, him.

15     Q.    You did -- you did not say, "You cut me

16    off"?  Is that your testimony?

17     A.    No.  I don't remember.

18     Q.    You just don't remember?

19     A.    No.

20     Q.    One way or the other?

21     A.    One way or the other.

22     Q.    So you could have said, "You cut me off"?

23         MR. BALDWIN:

24              Object to the form.

25         MR. WELBORN:
```

1              Same objection.

2  BY MR. PEULER:

3      Q.    You just don't know?

4      A.    I don't think I told him that.  All I

5  told -- I asked him -- I would have to sit and think

6  about this one a while.  It's been a while and I did

7  many of pills in between, and the memory of that is

8  very fuzzy.  But I think all I wanted from him was

9  the report.  And the guy told me, he said we got it

10 on the AIS.  You was doing 1.7.  He was doing 6.7 or

11 7.7 when he hit you.

12             MR. PEULER:

13                  Okay.  I will just object to the

14       non-responsiveness.

15             THE WITNESS:

16                  Well, object.

17 BY MR. PEULER:

18     Q.    After you made contact with the TRISTEN

19 while --

20     A.    I was on the TRISTEN.

21     Q.    When you went under the bridge and you

22 passed the BEVERLY BARRIOS being on the TRISTEN --

23     A.    That had nothing to do with the accident,

24 dude.

25             MR. WELBORN:

1         Let him talk.

2    BY MR. PEULER:

3         Q.    At that point, you had radio

4    communication with the BEVERLY BARRIOS, correct?

5         A.    I want to say I did, but he was nosed up

6    in the banks so I can't really say I did.  I think I

7    told you I did awhile ago, but I just don't

8    remember.

9         Q.    But you don't remember, right.

10        After that -- whether or not you had

11   communication with him at that point or not, I am

12   not worried.  After that, when was the next time you

13   had communication with him?

14        A.    After he passed through the bridge that

15   he was coming up on me.

16        Q.    Okay.  So let's get to -- when was he --

17   where was he coming up on you?  It would have been

18   after the MANNIE overtook it?

19        A.    Everybody was running circles around me

20   that day, you know.  You push six loaded barges and

21   probably millions of tons of salt.  They are all

22   passing you up.  So when they get to running, they

23   are going to come back and pass you up.

24        Now, when me and him talked, there wasn't

25   that much time in between him talking to me and

1          THE WITNESS:

2                  Okay.  All day long, ever since I

3          took the wheel, I have been hearing this man

4          talk on the boat.

5    BY MR. PEULER:

6          Q.    So he was on the radio constantly?

7          A.    Yeah.

8          Q.    All right.  But he wasn't constantly

9    trying to -- what I am trying to get is, you're

10   saying that he made an arrangement with you to pass?

11         A.    He made arrangements with me to pass.

12   What it says right here, that's not true.

13         Q.    That's not true?

14         A.    Where it says BARRIOS never made request

15   to pass our vessel and two, that's not true.  That

16   man -- we talked on the radio.  That was in my

17   statement.  We had radio contact.

18         Q.    All right.  As the MANNIE is overtaking

19   you -- well, first of all, let me just start here.

20   Can you just put a dot just so we have a frame of

21   reference of where the incident occurred.

22         A.    (Witness complies.)  I want to say right

23   in here somewheres.  Maybe further back.  Maybe

24   right in here.

25         Q.    Okay.  And that's on page 4 where he just

1  did two lines right above the rectangle --

2      A.    And it might be further back than that.

3  I mean, you are asking me to remember stuff I don't

4  remember right now.

5      Q.    Okay.  Well, I'm just -- I have maps in

6  front of you.  I am just trying to figure out where

7  the incident occurred.

8      A.    I think it would be easy, but I am having

9  trouble identifying exactly where it happened.

10     Q.    Okay.  So once the MANNIE --

11     A.    The MANNIE is cleared me.  He is gone.

12           I know I talk too fast.

13     Q.    I know you don't want anything to do with

14  the MANNIE, but, unfortunately, there is evidence

15  that you were cursing him out after so that's the

16  reason why I am exploring it.

17           MR. WELBORN:

18                Object to the form.

19           MR. BALDWIN:

20                I am going object to the form as

21      well.

22           THE WITNESS:

23                What's wrong with cursing?  If

24      somebody would run up in the back of you and

25      hit you --

1    that much, because when they called each one of

2    them -- when they called and asked me to overtake

3    me -- and I know I talk too much -- I gave him the

4    rights to overtake me as long as they checked with

5    the other vessels that they would hold up.  And the

6    other boats agreed to let them overtake.  They

7    stopped, in other words, to let them overtake me,

8    the other boats.  I know I am putting wires in your

9    head there.

10        Q.    So the boats that were coming westbound

11   stopped in order for the arrangement for the MANNIE

12   to overtake you or for the BARRIOS to overtake you?

13        A.    For both of them.

14        Q.    Okay.

15        A.    They were that close together, the MANNIE

16   and the BEVERLY BARRIOS.  Listen to me.  When one

17   cleared me, the other one was coming to pass me, but

18   he hit me.

19        Q.    So they were close by each other?

20        A.    Yes.  But the MANNIE had cleared me.  He

21   was -- the only thing that I wanted from him -- I

22   couldn't think of the word -- is a report.  I wanted

23   him to write a report on the thing and the man told

24   me wasn't involved in the accident.  Well, I know

25   that.  I might have cursed him out.  He could

1    apologize to the captain for me.  All I wanted was a

2    report.  We'd cut out a lot of this if we would have

3    had people that would have came up and say stuff,

4    you know.

5         Q.    So once the BEVERLY BARRIOS then -- you

6    are saying the MANNIE passes you and they are ahead

7    of you.  And then the BEVERLY BARRIOS makes contact

8    with you after that or before that?

9         A.    I think the -- I think the MANNIE was

10   about halfway passing me when he called me or a

11   little bit over halfway.  He wasn't in the picture.

12   That boat wasn't in the picture when I got hit.  I

13   don't think at least.  It might show different.

14   When I got hit, brah, I was thrown.  I was holding

15   on to a stick.  I fell backwards.  I went forwards

16   or I went forwards and then I went backwards.

17        Q.    You don't remember which one?

18        A.    No.

19        Q.    Okay.  So when the BEVERLY allegedly made

20   the arrangements to overtake your boat, the TRISTEN,

21   these vessels going westbound, were they still

22   stopped as well?

23        A.    Yes, sir.

24        Q.    Okay.  And they are stopped up on the

25   side of the shore?

1      A.     Yes, sir.   They are right off the --

2   right there, the water is deep real close to the

3   banks.

4      Q.     And you are saying that's probably three

5   vessels on that side that are stopped, hear the same

6   communication --

7      A.     At least three for sure.

8      Q.     -- hear the same communication going on

9   in the radio and is allowing both vessels, the

10  MANNIE and the BARRIOS --

11     A.     Yes.

12     Q.     -- to bypass?

13            MR. WELBORN:

14                 Object to form.

15                 You can answer.

16  BY MR. PEULER:

17     Q.    Overtake?

18     A.    Yes.

19            THE WITNESS:

20                 I forget that you are there, boss.

21            MR. WELBORN:

22                 I just don't want you to jump the

23      gun.

24  BY MR. PEULER:

25     Q.    When the MANNIE overtook you, did you

1    have to make strong maneuvers to your starboard or

2    port to allow the passing?

3         A.    I held my ground.

4         Q.    You held your ground, same -- same path?

5         A.    I was in the same path, the way I was

6    going to pass.

7         Q.    Okay.  Did you ever have to slow down

8    your speed?

9         A.    I told you that before, yes.  The

10   throttles were pulled back.

11        Q.    And you announced that on the radio?

12        A.    That is something you don't normally

13   announce.

14        Q.    You don't have to announce that, okay.

15        A.    They know I am slowing down to let the

16   boats pass me.

17        Q.    Right.  But you didn't announce on the

18   radio that you slowed down -- that you were about to

19   slow down?

20        A.    I don't think so.

21        Q.    Okay.  So in your statement, you believe

22   that you were going 1.7 knots at the time?

23        A.    Yes.

24        Q.    About 25 --

25        A.    In between 1.6, 1.7.  There is no device

1          Read what "this right here" is,

2     please.

3          THE WITNESS:

4               "The BEVERLY BARRIOS never requested

5     passing our vessel and tow."

6          The man talked.  We talked on the

7     radio.  This is old.  I am telling you the man

8     talked to me.  We had radio communication.

9     That's enough on this one.

10    BY MR. PEULER:

11    Q.     Okay.  And then what about the statement,

12    "The MANNIE passed safely, soon after; the TRISTEN

13    was struck in the starboard stern by a barge in the

14    tow of the BEVERLY BARRIOS," which is the last

15    sentence of the first paragraph?  Is it also your

16    testimony that's also incorrect?

17    A.     Yeah.  I believe that's correct.

18         MR. WELBORN:

19              That is correct.

20    BY MR. PEULER:

21    Q.     That is correct, okay.

22         That's correct?

23    A.     That's what I said.

24    Q.     Okay.  And just so we're clear, your

25    recollection from when the TRISTEN made this passing

1      A.     ICW, the Sounds, the Mississippi Sounds

2  and all going to Tampa.

3      Q.     Before December 19, 2012, had you passed

4  Cenac Bend heading eastbound more than 100 times?

5      A.     Yes, sir.

6      Q.     So you are very familiar with that area?

7      A.     Yes, sir.

8      Q.     How much horsepower does the M/V TRISTEN

9  have?

10     A.     I think it's got 1200 horsepower.  I

11 think that's what the power is or it is 1000

12 horsepower.

13     Q.     Do you know the dimensions of the

14 TRISTEN?

15     A.     I am not going to tell you.  I'm lying.

16     Q.     How many levels?

17     A.     One, two, three.

18     Q.     And the wheelhouse is on the third?

19     A.     Yes, sir.  I think it is around 67 to 70

20 foot long.  I am not sure.  I think it is 22 foot

21 wide, something like that.

22     Q.     And on that day in question, December 19,

23 2012, you were pushing a six-pack, right?

24     A.     Yes, sir.

25     Q.     Loaded barges?

1    A.    Yes, sir.

2    Q.    With salt?

3    A.    Yes, sir.

4    Q.    Okay.  What was the draft in the barges?

5    A.    About eight.

6    Q.    What was the draft of the TRISTEN?

7    A.    About six, seven foot.

8    Q.    I know you said you couldn't remember

9    whether they were boxes or rake barges, right?

10   A.    That's right.

11   Q.    But at a minimum, the barges would have

12   been at least 195 by 35, right?

13   A.    Yes.

14   Q.    Okay.  And so for -- and that's true for

15   all six barges in your tow on December 19, 2012,

16   right?

17   A.    Yes, sir.

18   Q.    And just so I am clear, you had them two

19   wide, three long?

20   A.    Yes, sir.

21   Q.    Do you know one way or another whether

22   that qualified you as an oversized tow on December

23   19, 2012?

24   A.    Well, I think they changed that law, but

25   you needed to get a permit.  They would get us our

1   permit to push the oversized two.

2       Q.      What is your understanding of the permit?

3   Do you have to get a permit for each tow?

4       A.      Yeah.   Anything over 54 foot wide I think

5   it is, or 55.   You got to have a special permit for

6   a wide tow and the tow won't give you no rights over

7   nobody.   You are supposed to let them pass you.

8       Q.      So as far as your understanding, if you

9   have an oversized tow, you have an obligation to

10  yield to the maximum to vessels that would be to

11  your stern?

12          MR. WELBORN:

13              Object to form.

14          MR. RAY:

15              Object to form.

16          THE WITNESS:

17              It can be to the stern or the bow if

18      they request their -- I think.   I am not sure.

19      I think if they request to pass, you got to

20      let them pass.

21  BY MR. BALDWIN:

22      Q.      And that would have been true as to the

23  M/V MANNIE on December 19, 2012, right?

24          MR. WELBORN:

25              Object to form.

1              You can answer.

2         THE WITNESS:

3              The what, sir?

4  BY MR. BALDWIN:

5     Q.    The M/V MANNIE --

6     A.    Yes.

7     Q.    The Enterprise boat.  That would have

8  been true, i.e., you had to allow them to pass?

9     A.    Yes.

10    Q.    On December 19, 2012?

11    A.    Most people wait until you get like in a

12  clearing to pass instead of trying to pass you in

13  the little towns and all.

14    Q.    Okay.  And it is your testimony that on

15  December 19, 2012, you had an oversized tow permit

16  for your tow?

17    A.    Yes.  I think the other captain had it.

18    Q.    The other captain?

19    A.    Yes.  Steve Winstead.  He died.

20    Q.    You said he had it.  He had a paper copy?

21    A.    Well, no.  He called the Coast Guard and

22  they -- they call the Coast Guard and they give you

23  the permit number.  Usually, you just write it on a

24  paper.

25    Q.    So as far as you understand, before the

1    December 19, 2012?

2        A.    Yes, sir.  The deckhand got the little

3    handheld where they go in the barge, and when they

4    go in the barges, we go like to another channel, 72,

5    the one that was on 16, and we communicate with

6    them.

7        Q.    I want to talk about the radio

8    communications that -- and expand on what you

9    testified about earlier today between you as captain

10   of the M/V TRISTEN and the captain of the M/V MANNIE

11   on December 19, 2012, okay?

12       A.    Okay.

13       Q.    All right.  As I understand it, you

14   testified that the captain of the M/V MANNIE radioed

15   to you and requested a passing arrangement.

16       A.    Yes, sir.

17       Q.    And in response to that, on December 19

18   2012, you agreed to that passing arrangement,

19   correct?

20       A.    I told them that I agreed with it, but to

21   check with the other boats that was waiting, if they

22   would wait longer to let them pass, because I had to

23   slow down to let them pass me.

24       Q.    And it is your understanding that those

25   other boats that you said to check with, those boats

1    did, in fact, wait for the passing to take place?

2        A.    Yes, sir, they did.  They agreed for both

3    boats to pass me.

4        Q.    So the one condition that you may have

5    put on the passing arrangement was met in that the

6    other boats agreed to allow the passing to take

7    place?

8        A.    That's right.

9        Q.    Did the captain of the M/V MANNIE ask you

10   to slow down during the passing?

11       A.    No.  I just did that on my own.  When

12   somebody goes to pass you, you automatically pull

13   them back and let them get by you as fast as they

14   can.

15       Q.    So as I understand it, the captain of the

16   M/V MANNIE at no time did he request you to slow

17   down?

18       A.    No, sir.

19       Q.    That's correct?

20       A.    That's right.

21       Q.    And when you slowed down to allow this

22   passing to take place, did you steer towards your

23   starboard side?

24       A.    I basically held what I was holding.

25       Q.    You didn't change your heading?

1       A.      No, sir.

2       Q.      You said earlier that people were running

3    circles around you all day that day.

4       A.      Yes.

5       Q.      And that's because you were pushing a

6    six-pack with a 1200 horsepower boat going no more

7    than four miles per hour, right?

8       A.      Yes.  About four and a half go, something

9    like that.

10      Q.      Okay.  And so as these people were

11   passing -- as these other boats were passing you

12   before this incident -- and I am talking about the

13   M/V MANNIE and the BEVERLY BARRIOS -- throughout the

14   day when you were at the sticks, you were slowing

15   down to allow them to pass, correct?

16      A.      Yes.

17      Q.      Okay.  And so when the M/V MANNIE called

18   you to make a passing arrangement, you did what you

19   had done many times that day before?

20      A.      Many times that week before.

21      Q.      And when I say you did what you did many

22   times that day, I am talking about slowing down and

23   allow them to pass, right?

24      A.      Yes, sir.  Yes, sir.

25      Q.      Okay.  After the M/V MANNIE passed you,

1   did the M/V MANNIE's captain call you to let you

2   know that the passing had been completed?

3       A.    I don't remember.

4       Q.    Okay.  If the captain of the M/V MANNIE

5   were to testify that he called you to let you know

6   that he had passed you, would you disagree with

7   that?

8       A.    I couldn't disagree because I don't

9   remember it.

10      Q.    Okay.  But as far as you were concerned,

11  the passing was complete?

12      A.    Oh, yeah.  He was way past me.

13      Q.    He was way past you?

14      A.    Yes.

15      Q.    And he was way past you at the time that

16  you were struck from behind by the M/V BARRIOS?

17      A.    Yes, sir.  He was cleared me.

18      Q.    All right.  Other than the radio

19  communication that you do remember between the

20  captain of the MANNIE requesting the passing

21  arrangement, do you recall specifically any other

22  radio communications between yourself and the

23  captain of the M/V MANNIE?

24      A.    Well, they said I cursed them out.  I

25  don't remember that.  You know, when stuff happens,

1    you just go.  It happened so fast, I don't know.

2        Q.    But you certainly don't blame the captain

3    of the M/V MANNIE --

4        A.    No, I don't blame him at all.  All I

5    wanted was a report from him.

6        Q.    And there is nothing in your mind that

7    the captain of the M/V MANNIE did --

8        A.    No, sir.

9        Q.    -- that caused this incident?

10       A.    No, sir.

11       Q.    Do you know one way or another whether

12   you, as captain of the M/V MANNIE -- TRISTEN, excuse

13   me, had an obligation to maintain course and speed

14   during a passing?

15       A.    That's what we normally do, try to hold

16   the course.  You try to stay out of their way.

17       Q.    And in your mind, did you do those two

18   things, stay out of the way?

19       A.    Yes, sir.

20       Q.    And maintain course and speed?

21       A.    Yes, sir.

22       Q.    Okay.  I want to talk about the

23   navigation equipment that you had on the M/V TRISTEN

24   on December 19, 2012.  Let's go through it real

25   quick.  You had radars onboard?

1    A.    No.  We didn't ground it.

2    Q.    Okay.  And stated another way, neither

3  the tow, nor the TRISTEN stopped in the ICW --

4    A.    No.

5    Q.    -- on December 19, 2012?

6    A.    We stopped after the accident.

7    Q.    Okay.  But you didn't stop during the

8  accident?

9    A.    No, sir.

10   Q.    You didn't stop in the preceding seconds

11 before the accident?

12   A.    No, sir.

13   Q.    That narrow stretch of the ICW that goes

14 -- that you were on before you reached Cenac Bend,

15 do you know what I am talking about, sir?

16   A.    Yes, sir.

17   Q.    And that's the stretch between the Houma

18 Navigational Canal Bridge and the oyster house?

19   A.    Yes.

20   Q.    Is it your understanding that stretch is

21 by custom one-way traffic?

22   A.    Yes, sir.

23   Q.    Okay.  And at the time that you were

24 transiting aboard the TRISTEN on December 19, 2012,

25 that stretch before you got to the oyster house, it

1    was one-way traffic, right?

2        A.    Yes, sir.

3        Q.    And because of the custom of one-way

4    traffic before the collision took place on December

5    19, 2012, where -- were there westbound tows pushed

6    up into the northern bank in Cenac Bend?

7        A.    Yes, sir.

8        Q.    And that's customary, right?

9        A.    Yes, sir.

10       Q.    And that's because, again, it is one-way

11   traffic in the stretch that they are about to enter?

12       A.    Yes, sir.

13       Q.    Okay.  And that, again, wasn't out of the

14   realm of -- it wasn't abnormal to have that happen

15   on December 19, 2012?

16       A.    People pass there and overtook people all

17   of the time.  Something always happens.

18       Q.    Okay.  The bridges that you were

19   referring to earlier in your testimony with Mr.

20   Peuler, I just want to make it clear on the record.

21   You testified that the BEVERLY BARRIOS was stopped

22   at the Bayou Dularge Bridge?

23       A.    Yes.

24       Q.    And the Bayou Dularge Bridge is a bridge

25   over the ICW, correct?

1      Q.    And he was a deckhand?

2      A.    Yes.  And Brian -- Brian Doherty I think

3  his name is.

4      Q.    And what was he?  Was he a deckhand as

5  well?

6      A.    Yes.

7      Q.    Who had engineering duties on the boat?

8      A.    We all took -- I don't care what they

9  say, everybody takes part care to upgrade.  Nobody

10  can lie.  If they tell you they don't, they are

11  lying.

12      Q.    So you had the knowledge and expertise to

13  help out?

14      A.    Yes, sir.

15      Q.    You had the knowledge and expertise with

16  engineering issues on the M/V TRISTEN?

17      A.    Yes, sir.

18      Q.    Okay.  And that's because of your history

19  as a mariner?

20      A.    Yes, sir.

21      Q.    I know you testified about a boat that

22  was coming westbound in the Cenac Bend at roughly

23  the same time that the M/V MANNIE had either

24  completed its passing or was in the midst of passing

25  you.  Do you recall that?

1    A.    Yes, sir.

2    Q.    Do you know the name of that boat?

3    A.    No, sir.

4    Q.    Okay.

5    A.    That's what I told him earlier.

6    Q.    And my question is, do you recall having

7    any radio communications with that boat?

8    A.    Yes.  We all talked to them at one time

9    or point because I was going to meet him.  I had to

10   talk to them.  The MANNIE talked to him and the

11   other boat talked to him.

12   Q.    Did you have a meeting agreement with

13   that boat coming westbound in the Cenac Bend on

14   December 19, 2012?

15   A.    I should have.

16   Q.    Okay.  And that would have been to meet

17   on one whistle?

18   A.    Yes, sir.

19   Q.    Okay.  And as far as you understand,

20   there were no issues with that meeting arrangement?

21   A.    No.

22   Q.    No as in there were no issues?

23   A.    No issues.

24   Q.    Okay.  What type of logs do they keep on

25   the M/V TRISTEN for the voyage on December 19, 2012?